## BENNETT and others *v.* McGILLAN.[1]

*(Circuit Court, N. D. Illinois.* July 26, 1886.)

PAYMENT—APPROPRIATION OF PAYMENTS—SALE.

A counter-claim of purchaser against seller, of which the time of payment is not expressly fixed by the contract of sale, should be deducted from an earlier, rather than a later, cash payment to be made by the purchaser. This is so, although the purchaser had the option to make such earlier payment in cash, or in land at a fixed valuation, and the subsequent payment was to be in cash or negotiable notes.

At Law.

*McCoy, Pope & McCoy, Mr. Johnson,* and *Mr. Peake,* for plaintiff.
*House & Fry* and *Mr. Kline,* for defendants.

BLODGETT, J. This is a suit to recover a balance claimed by plaintiffs to be due them from defendant upon the sale of a cattle ranch, with the outfit, fixtures, and cattle pertaining thereto, in the Indian Territory. This case was tried by the court without a jury, and depends mainly upon the legal construction to be given to the contract, rather than on any disputed facts.

The material facts, as they appear in the proof, are that, on or about the sixteenth of April, 1885, the plaintiffs entered into a contract with the defendant, whereby they agreed to sell to the defendant, for the sum of $400,000, their ranch, cattle, horses, wagons, mules, hogs, and ranch outfit, located in the Indian Territory, at or near the junction of the Arkansas and Cimaron rivers, more particularly described as follows:

"12,500 head of cattle, to be counted, and averaging in age and sex about as follows: 3,000 head of three, four, and five year old steers; 3,000 head of two-year olds, mixed; 5,000 head one-year old, mixed; 1,500 head of cows and bulls,—calves born in 1885 not to be counted; 125 head of horses; and all the mules, wagons, harness, hogs, and ranch outfit, located on the said ranch, and used in connection therewith; and all their right, title, and interest in and to a certain lease for 128,000 acres of land, known as the ' Cherokee Lease,' dated October, 1883, and running five years from the date thereof, at a yearly rental of two and a half cents per acre; also all their right, title, and interest in and to the said lease for 127,265 acres of land known as the 'Pawnee Lease,' dated June 1, 1884, and running five years from date, at an annual rental of three cents per acre; and to deliver possession of all said property to defendant on or before the fifteenth day of July, 1885."

Should the number of cattle delivered exceed 12,500 head, the defendant was to pay in cash the sum of $25 per head for such excess; and should the said number fall short of 12,500 head, plaintiffs were to credit defendant on the amount to be paid at the rate of $25 per head for such deficit. The sum of $400,000 for said ranch

[1] Edited by Russell H. Curtis, Esq., of the Chicago bar.

and cattle was to be paid by the defendant as follows: The sum of $25,000 was to be paid in cash at the time of making said agreement; the sum of $75,000 was to be paid July 25, 1885, and for which the defendant was to give his negotiable promissory notes of even date with said contract, payable on the twenty-fifth day of July, 1855, with 8 per cent. interest; $66,000, to be paid July 1, 1886; $66,000, to be paid November 1, 1886,—for which two last-named amounts defendant was to execute his negotiable promissory notes, bearing date July 15, 1885, and payable July 1, 1886, and November 1, 1886, with 8 per cent. interest per annum from the date of said notes; and the remaining $168,000 was to be paid by said defendant on the fifteenth day of July, 1885, by the conveyance to the plaintiffs, by deed of general warranty, free and clear of all incumbrances, taxes, and liens of every kind and character, of 84 acres of land in Crosby's subdivision of the S. $\frac{1}{2}$ of section 5, township 37 N., range 13 E., situated in the county of Cook and state of Illinois.

The defendant paid the $25,000 called for by the contract to be paid at the time the contract was made, and gave his notes for the $75,000 payable July 25, 1885, which were duly paid at maturity. It also appears that between the first and fourteenth days of July, 1885, plaintiffs delivered to defendant the ranch and ranch outfit, and property pertaining thereto, and 4,854 head of cattle, and defendant accepted the same; that plaintiffs were unable, by reason of losses in the preceding winter, to deliver the full number of cattle called for by the contract; and that there was a deficiency or shortage in the cattle of 7,646 head, which, at the rate of $25 per head, made the sum of $191,150 to be credited the defendant on the purchase price of $400,000; and as defendant had paid the cash payment of $25,000, and given his negotiable notes for the $75,000 due July 25th, there was, after crediting the shortage of $191,150, only a balance of $108,850 to be paid plaintiffs. This balance, plaintiffs contended, should be included in equal time-notes, payable in July and November, 1886; but the defendant refused to give the notes, and contended that he was entitled to apply this credit of $191,150, first, in the extinguishment of the amount to be secured by the time-notes payable in 1886, and the remainder of this credit was to be applied on the payment to be made in Cook county land, and that he was entitled to convey the entire Cook county lands to plaintiffs, and plaintiffs were bound to accept the same, and to pay him the sum of $59,150 in cash for said land. In other words, that the plaintiffs were bound to take the land at $168,000, and pay defendant the balance of $59,150 which would remain unpaid for the land by the delivery of the ranch and cattle. So that the controversy in the case is as to whether the plaintiffs were bound to accept this land at the price fixed in the contract, and make up in cash the deficiency in the price to be allowed for it, or whether plaintiffs could insist that the credit for the shortage on the cattle should be applied, first, to ex-

tinguish the payment defendant was to make in Cook county land, and then upon the amount to be secured by the time-notes due in July and November, 1886, thus leaving this balance of $108,150 due plaintiffs; and this suit is brought to recover this balance of $108,-150, on the ground that, defendant having refused to give his notes, it became at once a money demand.

It was conceded upon the trial that the plaintiffs were the owners of the ranch in question, and had thereon, in the fall of 1884, the full number of cattle specified in the contract; and that they supposed, in good faith, at the time the contract was made, that they would be able to deliver to defendants the full number of 12,500 head of cattle; but that, by reason of the severity of the winter of 1884–85, the plaintiffs' losses of cattle were so great they were unable to deliver more than 4,854 head stated. From this large deficiency in the number of cattle, which I may say, from the proof, appears to have been unexpected on the part of both parties, has arisen the difficult question of law to be determined in this case. Upon the trial I admitted a large mass of testimony in regard to the preliminary negotiations, correspondence, and interviews between the contracting parties and their brokers, for the purpose of obtaining, if possible, some light upon the true construction to be given to the terms of the contract, in view of the embarrassing questions which are in controversy; but I feel compelled to say that very little, if any, light as to the construction to be given to the contract was obtained from this testimony. The proof satisfies me that the plaintiffs, in good faith, believed that they had the full number of cattle named in the contract, and would be able to deliver them at the time stipulated; and I have no doubt that the defendant expected at that time to receive that number of cattle, and to pay for them in the manner provided in the contract. That there might be a comparatively small surplus or excess of cattle over and above the number called for by the contract, or that there might be a small deficiency, is clearly indicated by the terms of the contract itself, and from the parol proof; but I have no doubt, from the proof, that neither party anticipated so large a shortage of cattle, or that any serious difficulty or question would arise by reason of such excess or deficiency. The contract provided that any excess of cattle above 12,500 head should be paid for in cash by the defendant, at the rate of $25 per head for such excess, and, should the number fall short of 12,500 head, the plaintiffs were to credit the defendant on the amount to be paid at the rate of $25 per head for such deficit.

It appears from the proof that the defendant refused to enter into the contract except upon condition that the Cook county land was to be taken at the specified price as part payment; and it also appears, with equal certainty, that the plaintiffs insisted that they would not sell unless they could get about $250,000 in cash, or what was equivalent to cash. The fair and natural conclusion in regard to the state

of mind of the parties, and the view they took of the transaction at the time the contract was made, I think, is that the plaintiffs, on the assumption that they had 12,500 head of cattle to deliver, and would get about $250,000 in money, or what was the equivalent of money in cash and negotiable paper, were willing to make the sale to defendant for $400,000, and the defendant, supposing or assuming that he was to pay the full sum of $400,000, would not agree to make the purchase except upon the condition that the land was to be taken at $168,000, as part of said sum of $400,000; and I think, from the parol proof, that plaintiffs did not consider the Cook county land as the equivalent for cash at the full amount of $168,000, at which they were to receive it in payment.

After the difficulty arose between the parties growing out of this large deficiency in the number of cattle, as I have already said, defendant insisted that the contract amounted to a sale of this land to the plaintiff for $168,000, and that, inasmuch as plaintiffs had not cattle enough to fully pay for the land, they were therefore under obligation to make up that deficiency in cash. Afterwards, however, and in a subsequent interview between the parties, the defendant offered to convey to the plaintiffs 54 acres of this land in fulfillment of the contract on his part, but without designating from what part of the 84 acres this 54 acres was to be taken. Plaintiffs refused to accept this latter offer, claiming that they were entitled to time-notes due in July and November, 1886, or, if defendant refused to give such notes, then they were entitled to the money at once. The defendant tendered the plaintiffs no deed, either for the entire tract of 84 acres, or the 54 acres which he subsequently offered to convey; but I think the proof satisfactorily shows that the defendant was in condition to have made the plaintiffs a good title either to the whole 84 acres, or any part of the tract.

It seems to me that, when an actual count of the cattle showed this large deficit in the number, defendant might properly have refused to accept the property and put plaintiffs in default upon their part of the contract; but he elected to accept what plaintiffs had to deliver on the contract, and must be held to have thereby assented to such readjustment of its terms as were made necessary by the changed facts. I do not think that either party to this contract intended or understood at the time it was made that plaintiffs were to buy this Cook county land from defendant unless they paid him for it in the ranch and cattle property. My construction of the contract is that it gave the defendant the option of paying $168,000 of this purchase money by the conveyance of this Cook county land; that if the defendant had declined to make the conveyance, or been unable to give a good title, the amount to be liquidated by the conveyance of the land would have at once become a money payment, and would have been payable in cash on the fifteenth of July, 1885. If the plaintiffs had delivered the whole number of cattle contemplated by the contract, they would

have been entitled to the note for $66,000, due July 1, 1886, and another note for the same amount, due November 1, 1886, and also to a deed of the Cook county land, or the amount of cash at which the land was to be applied on the contract, in case the defendant should refuse or be unable to make a deed.

I think, therefore, that the land payment is to be treated as a present or cash payment, and that the deficiency, at the rate of $25 per head, which is to be credited to the defendant, should be appropriated in liquidation of this cash payment; that is, upon the law of the appropriation of payments, the court should apply this credit to the cash which the defendant would have been called upon to pay in case he should have been unable to make the title at the time called for. The $168,000 to be liquidated by the land is a present payment, whether it is to be made in money or land; and if the defendant, by the terms of the contract, is entitled to a credit equal to or exceeding the purchase price of the land, it should be applied upon this payment to be made in land, rather than upon the deferred payments to be evidenced by notes; that is, the land was a down payment, to be made at the time of the completion of the contract.

While it undoubtedly can be said, from the proof, that neither party anticipated the questions which have arisen by reason of this large deficiency in the number of cattle, yet, at the same time, the contract does in terms provide for just this contingency, without, however, providing upon which of the payments the deficiency should be applied, if it should be large enough to exhaust either; and it becomes the duty of the court, therefore, by construing the terms of the contract, to make the application. After considerable reflection, and not without much doubt as to the soundness of my conclusion, I have finally decided that the better reasons support such construction of the contract as requires that this credit should be appropriated to the extinguishment of this $168,000 which defendant was to pay at the time the property was delivered, and which he might have paid either in cash, or by the conveyance of this land. Making the application of this credit, first, to extinguish the land payment, leaves the sum of $108,850 due plaintiffs for which defendant should have given his notes payable in July and November, 1886, with interest at 8 per cent. He declined to give such notes, or any notes, and hence this balance became a present demand, and could be sued for.

I therefore find the issues for the plaintiffs, and assess the damages at $108,850, with interest at 6 per cent. from July 15, 1886.